FILED

DEC 2 7 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| LOUISIANA WHOLESALE DRUG COMPANY, INC. and ROCHESTER DRUG COOPERATIVE, on behalf of themselves and all others similarly situated, ) ) ) ) ) | CASE NUMBER   1:04CV02235 |
| Plaintiffs, ) ) | ( JUDGE: Richard J. Leon |
| v. ) ) | DECK TYPE: Antitrust |
| BIOVAIL CORPORATION, and FOREST LABORATORIES, INC., ) ) ) | DATE STAMP: 12/27/2004 |
| Defendants. ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, for their Class Action Complaint ("Complaint") against defendants Biovail Corporation ("Biovail") and Forest Laboratories, Inc. ("Forest") (collectively "Defendants") allege as follows based on: (a) personal knowledge; (b) the investigation of its counsel; and (c) information and belief.

## I.  NATURE OF THE ACTION

1.     Tiazac is a brand name, extended-release diltiazem hydrochloride product prescribed for hypertension and angina that is manufactured by Biovail and marketed by its exclusive licensee, Forest pursuant to a joint venture or combination described more fully below. This civil antitrust action seeks treble damages arising out of Biovail's unlawful scheme to illegally maintain Defendants' monopoly in the United States market for Tiazac and its AB-rated generic equivalents.

in order to list a patent in the publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book"), which listing provided Biovail with the ability to exclude competition from generic manufacturers wrongfully, and (2) conducting sham litigation against a generic manufacturer, which triggered an automatic regulatory bar of up to thirty-months to generic competition.

2.      Defendants' U.S. sales of Tiazac were approximately $270 million in 2002. Until at least April 10, 2003, no competing generic version of Tiazac was marketed in the United States.

3.      As a result of the illegal acts described herein, Defendants have: (1) unreasonably restrained, suppressed, and eliminated competition in the market for Tiazac and its generic equivalents ("Tiazac Products"); (2) illegally maintained monopoly power over the price of Tiazac Products; (3) fixed, raised, maintained, and/or stabilized the price of Tiazac at supra-competitive levels; and (4) overcharged Plaintiffs and other direct purchasers of Tiazac millions of dollars by depriving them of the benefits of competition from lower priced generic versions of Tiazac.

4.      Until at least April 10, 2003, Defendants possessed monopoly power over the price of Tiazac Products, which it willfully and illegally maintained, as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident.

2

## II. JURISDICTION AND VENUE

5.      This Complaint is filed and these proceedings are instituted under Section 4 of the

Clayton Act, 15 U.S.C. § 15, to recover threefold damages and the costs of suit, including a

reasonable attorneys' fee, for the injuries sustained by Plaintiffs and members of the Class (defined

below) resulting from violations by the Defendants, as hereinafter alleged, of Section 2 of the

Sherman Act, 15 U.S.C. § 2. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and

1337(a) and 15 U.S.C. § 15.

6.      Defendants transact business within this district, and the interstate trade and

commerce, hereinafter described, is carried out, in substantial part, in this district. Venue, therefore,

is appropriate within this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).

### III. THE PARTIES

7.      Plaintiff Louisiana Wholesale Drug Company, Inc. ( "Louisiana Wholesale") is a

corporation organized under the laws of the State of Louisiana and is located at 2085 I-49 South

Service Road, Sunset, Louisiana 70584. Louisiana Wholesale, a drug wholesaler, purchased Tiazac

directly from Defendant Forest during the Class Period as defined below

8.      Plaintiff Rochester Drug Cooperative ("Rochester") is a drug wholesale

cooperative located in Rochester, New York. Rochester purchased Tiazac directly from Defendant

Forest during the Class Period as defined below.

9.      Defendant Biovail Corporation is a corporation organized under the laws of the

Province of Ontario, Canada, with its principal place of business at 2488 Dunwin Drive,

Mississauga, Ontario, Canada. Biovail has offices in the United States located at 3701 Concorde

Parkway, Chantilly, Virginia. Biovail regularly conducts business in the District of Colombia, has

3

engaged both directly and indirectly in substantial activity in the District of Columbia. Biovail is in the business of, among other things, developing, manufacturing, distributing, advertising, and selling Tiazac throughout the United States.

10.    Defendant Forest is a Delaware corporation with its principal place of business in New York. Forest was Biovail's marketing partner for Tiazac (according to Biovail's 2002 Annual Report on Form 20-F). As described in more detail below, Forest marketed and sold Tiazac in the United States through its combination or joint-venture with Biovail pursuant to an exclusive licensing and manufacturing agreements entered into by Forest and Biovail in September 1995.

## IV.  CLASS ACTION ALLEGATIONS

11.    Plaintiffs bring this action on behalf of itself and, under Rule 23 of the Federal Rules of Civil Procedure, as representatives of a Class defined as follows:

> All persons or entities in the United States who purchased Tiazac directly from Forest at any time during the period of February 13, 2001 through the present (the "Class").

Excluded from the Class are Defendants, their officers, directors, management and employees, subsidiaries or affiliates, and all governmental entities.

12.    Members of the Class are so numerous that joinder is impracticable. While the exact number of Class members is unknown to Plaintiffs, it is believed to be in the hundreds. Furthermore, the Class is readily identifiable from information and records in the possession of Defendant.

13.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendant, *i.e.*, they paid artificially inflated prices for Tiazac Products because they were deprived of the benefits of competition from cheaper generic versions of Tiazac as a result of Defendant's wrongful conduct.

4

14.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

15.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, particularly class action antitrust litigation in the pharmaceutical industry.

16.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Defendant has acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.

17.     Questions of law and fact common to the Class include:

    a.      whether Defendants had monopoly power over the price of Tiazac Products;

    b.      whether Defendants illegally maintained such monopoly power;

    c.      whether the '463 patent was wrongfully listed in the Orange Book;

    d.      whether sham lawsuits were instituted in order to delay entry of generic competition;

    e.      whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and

    f.      whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiffs and the members of the Class, and if so, the appropriate measure of damages.

18.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual

5

actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

19.     Plaintiffs knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V. FACTUAL BACKGROUND

**A.      The Regulatory Structure Pursuant to Which Generic Substitutes for Brand-Name Drugs Are Approved**

20.     Under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301-392), manufacturers who create a new drug must obtain the approval of the U.S. Food and Drug Administration ("FDA") to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

21.     In 1984, Congress amended the Food, Drug and Cosmetic Act with the enactment of the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), otherwise known as the Hatch-Waxman amendments ("Hatch-Waxman").

22.     Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need to file a lengthy and costly NDA in order to obtain FDA approval. Instead, the FDA provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA").

23.     The ANDA references and relies upon the scientific findings of safety and effectiveness included by the brand-name drug manufacturer in the original NDA. The ANDA filer must show the FDA that the generic drug it is going to market is bioequivalent to the referenced brand-name drug.

24.     Hatch-Waxman also streamlined the process for a brand-name manufacturer to enforce its patents against generic manufacturers, and provided the brand-name manufacturer with what is essentially a self-executing preliminary injunction against generic competition, in the form of an automatic stay of FDA approval of the ANDA that may last as long as thirty months.

25.     Under Hatch-Waxman, the NDA holder submits a list of patents, if any, that "claim[] the drug for which the applicant submitted the application or which claim[] a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1). Under FDA regulations, the only types of patents that can be submitted by the NDA filer are drug substance patents, drug product patents and method of use patents. Drug product patents may be submitted only if they claim "a drug product that is the subject of a pending or approved application." Drug substance patents may be submitted only if they claim "a drug substance that is a component of [the drug product that is the subject of the NDA]." Method of use patents may be submitted only if they claim an approved (or pending) use of the drug product.

26.     When the FDA approves a brand-name manufacturer's NDA, the FDA publishes the patents, if any, submitted by the NDA filer in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book." 21 U.S.C. §355(j)(7)(A)(iii). In listing patents in the Orange Book, the FDA merely performs a ministerial act.

7

The FDA does not check the facts supplied to it by the brand-name manufacturer, but trusts that the manufacturer will be truthful. The FDA does, however, require that the NDA holder submit a certification attesting to the propriety of the Orange Book listing. After the NDA is approved, the brand-name manufacturer may list other newly-issued patents in the Orange Book under the NDA, if the brand-name manufacturer similarly certifies, *inter alia*, that the new patents claim either the approved (or pending) drug product, a drug substance in that drug product, or an approved (or pending) method of using that drug product.

27.     Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

    a.    that no patent for the brand-name drug has been filed with the FDA (a "paragraph I certification");

    b.    that the patent for the brand-name drug has expired (a "paragraph II certification");

    c.    that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "paragraph III certification"); or

    d.    that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").

21 U.S.C. §355(j)(2)(A)(vii).

28.     To obtain FDA approval of an ANDA (and thus the legal right to sell a generic version of a brand-name drug) prior to the expiration of a patent listed in the Orange Book for the referenced NDA, a generic manufacturer must certify that the generic drug addressed in its ANDA does not infringe any valid claim in that patent (i.e., the generic must file a paragraph IV certification).

8

29.     If a generic manufacturer files a paragraph IV certification asserting that the patent is invalid or will not be infringed, then the brand-name manufacturer has the opportunity to delay the generic manufacturer's receipt of final FDA approval, and thus, the ability to come to market. This is because a generic manufacturer filing a paragraph IV certification must promptly give notice of its ANDA certification to both the NDA owner and the owner of the patent(s) at issue. The generic manufacturer's act of filing a paragraph IV certification triggers the time by which a patent owner may file an action for patent infringement, and take advantage of the self-executing stay of FDA's ability to finally approve the generic version of the NDA owner's drug.

30.     If the patent owner fails to initiate a patent infringement action within 45 days after receiving the generic manufacturer's paragraph IV certification, then the FDA may grant final approval to the generic manufacturer's ANDA once it concludes that the generic is bioequivalent to the brand-name drug. If, however, the patent owner initiates an infringement action against the ANDA filer within 45 days, then the FDA may not finally approve the ANDA until the earlier of either 30 months or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii).

31.     Additionally, the Hatch-Waxman statutory scheme in place at all relevant times provided a 180-day period of market exclusivity to the first generic manufacturer that filed an ANDA containing a paragraph IV certification, commencing on the date the generic manufacturer began marketing the new drug or, if there was a patent infringement claim against it, from the date the generic manufacturer received a patent infringement decision in its favor, whichever was earlier. If neither of these conditions occurred, the exclusivity period would not expire and no other generic manufacturer could market its generic version of the affected drug.

32.     If the generic manufacturer files a paragraph I certification, asserting that no patent for the brand-name drug has been filed with the FDA, no automatic 30-month stay delaying final FDA approval is applicable.  Similarly, a generic manufacturer that files a paragraph I certification is not entitled to the 180-day period of market exclusivity.

33.     Typically, generic versions of brand-name drugs are initially priced significantly below their corresponding brands.  As a result, direct purchasers substitute generic versions of the drug for some or all of their purchases.  As time passes, prices for generic versions of a drug tend to decrease even further.  Moreover, the brand-name drug continues to lose even more market share to the generics.  This price competition enables all direct purchasers of the drugs to: (a) purchase generic versions of a drug in substitution for the brand at substantially lower prices; and/or (b) purchase the brand-name drug at reduced prices.  Consequently, brand-name drug manufacturers have a substantial and compelling financial interest in delaying generic competition.

**B.      Tiazac**

    **1.      NDA Approval**

34.     Tiazac is a once daily diltiazem hydrochloride extended release capsule used in the treatment of hypertension and chronic stable angina.  The FDA approved Tiazac for sale in the United States in September 1995 pursuant to NDA 20-401.

35.     Tiazac is not reasonably interchangeable with any other pharmaceutical product other than its AB rated generic equivalents.  For instance, the FDA has noted that Tiazac is not therapeutically equivalent to other once-a-day diltiazem products:

> [W]hen generic versions of Tiazac, Cardizem CD, or Dilacor XR are approved, FDA
>
> will take appropriate steps to make the Orange Book clear that Tiazac, Cardizem CD

10

and Dilacor XR are not therapeutically equivalent to each other, that the generic drug products that are therapeutically equivalent to one of the three referenced listed drugs for diltiazem hydrochloride are not therapeutically equivalent to either of the other two.

2.   **Biovail/Forest Combination For the Joint Purpose of Manufacturing and Selling Tiazac**

36.   Shortly after the FDA approved Biovail's Tiazac NDA, Biovail, through Forest began marketing Tiazac in the United States pursuant to an exclusive licensing, investment and manufacturing agreement entered into by Forest and Biovail on September 11, 1995. As explained in more detail below, pursuant to these agreements, Biovail and Forest formed a combination for the joint purpose of manufacturing, marketing, distributing and selling Tiazac in the United States. Forest was the exclusive marketing and sales outlet for the drug in the United States and Biovail was the exclusive manufacturer of the drug (with the limited exception that Biovail gave Forest a license to manufacture the product in the event Biovail was unable or unwilling to supply Forest with sufficient quantities of Tiazac). As described below, until April 2003, Defendants had a monopoly over the price of Tiazac and its AB rated generic equivalents. Thus, both Defendants benefitted from the wrongful conduct to extend the Tiazac monopoly and to charge supra-competitive prices for the drug, which harmed Plaintiffs and the Class.

A.   **The Licensing Agreement**

37.   The aggregate consideration paid by Forest to acquire the exclusive license to Tiazac (which included Forest's acquisition through a tender offer of a 22% equity interest in Biovail) was

11

approximately $95.6 million. The license agreement also provides Biovail with a royalty payment of 8% of net sales for 16 years, that commenced December 1995.

38.     Under the terms of the license agreement, Biovail and Forest agreed to cooperate and work jointly with the FDA with respect to certain matters relating to the Biovail's NDA or any supplement thereto. Either party is entitled to attend any meeting with the FDA arranged by the other and had an obligation to inform the other as soon as possible after the meeting was arranged. The licensing agreement also required the parties to inform each other of communications with the FDA:

> All communications with the FDA by Forest or by Biovail shall be confirmed in writing to the other, and each of the parties shall provided to the other copies of all documents send to or received from the FDA regarding the Biovail NDA.

39.     Additionally, the licensing agreement requires Forest to market Tiazac in full compliance with, *inter alia*, Biovail's approved Tiazac NDA. Specifically, the licensing agreement provided that:

> **Forest shall Market the Product in full compliance** with all applicable laws and regulations in the Territory and with **the Approved Biovail NDA and any approved supplement thereto**. Forest shall take all reasonable steps to ensure that no claims for the Product are made by Forest or anyone acting on its behalf that have not been approved by the FDA.

40.     The licensing agreement also provides that Biovail had primary responsibility to prosecute any patent infringement actions. However, if Biovail failed to commence such action or take appropriate steps in a reasonable time, Forest was "entitled to take such reasonable steps against such infringement or misappropriation for the protection of Biovail's and/or Forest's rights, and if necessary may do so in the name of and on behalf of Biovail."

### B.   The Supply Agreement

12

41.     Under a 16 year supply agreement, Biovail agreed to supply Tiazac for sale in the United States for sales to Forest exclusively.  Forest agreed that it would purchase all of its requirements for Tiazac from Biovail.  Biovail reserved to itself the exclusive right to manufacture Tiazac for sale in the United States.  Biovail receives contractually determined manufacturing fees from Forest.   The agreement provides that Forest would pay to Biovail the greater of the Scheduled Price for Tiazac or a certain percentage of Forest's price to its customers for the drug.

42.     The supply agreement places responsibilities on both parties to ensure compliance with "Manufacturing Standards", defined under the supply agreement to mean "applicable cGMP regulations and other applicable governmental requirements, **including those portions of the Approved Biovail NDA or any approved supplement thereto relating to the Manufacture of the Product**." (emphasis added)   Biovail is obligated to ensure that Tiazac was manufactured in accordance with "Manufacturing Standards."  Forest is obligated to conduct tests that it deemed necessary to determine compliance with "Manufacturing Standards."  Forest is also obligated to maintain the product in full compliance with "Manufacturing Standards."

43.     The supply agreement, like the licensing agreement, provides that Biovail and Forest would cooperate and work jointly with the FDA with respect to certain matters relating to the Biovail's NDA or any supplement thereto.  Either party was entitled to attend any meeting with the FDA arranged by the other and had an obligation to inform the other as soon as possible after the meeting was arranged.

### 3.     The '791 Patent Litigation

44.     As of June 22, 1998, the only patent listed in the Orange Book under the Tiazac NDA was U.S. Patent Number 5,529,791 ("the '791 patent").

13

45.     On or about June 22, 1998, Andrx Pharmaceuticals, Inc. ("Andrx"), a Florida-based company that specializes in developing generic versions of extended-release, branded pharmaceuticals, submitted an ANDA to the FDA to market a generic version of Tiazac. Andrx's application included a paragraph IV certification asserting that its generic product would not infringe any patent claiming Tiazac.

46.     On October 7, 1998, Biovail filed a patent infringement lawsuit against Andrx in the U.S. District Court for the Southern District of Florida, alleging that Andrx's proposed generic bioequivalent version of Tiazac would infringe its '791 patent. Simply by filing this lawsuit, Biovail automatically triggered a provision under the Hatch-Waxman Act preventing the FDA from granting final approval of Andrx's ANDA for up to thirty months or until court resolution of the patent litigation.

47.     On March 6, 2000, the federal district court ruled in Andrx's favor, finding that its generic bioequivalent version of Tiazac did not infringe the '791 patent. Biovail appealed this decision, and the United States Court of Appeals for the Federal Circuit affirmed the district court's ruling on February 13, 2001.

48.     The FDA tentatively approved Andrx's ANDA for generic Tiazac on September 29, 2000, and informed Andrx that the ANDA would be eligible for final approval upon the earlier of the expiration of the 30-month stay (on February 26, 2001) or the date of the order by the U.S. Court of Appeals for the Federal Circuit. Because of the decision of the Court of Appeals for the Federal Circuit, the FDA would have been legally permitted to grant final approval of Andrx's ANDA for generic Tiazac on or around February 13, 2001. However, because of Biovail's anticompetitive

14

conduct described in more detail below, final FDA approval could not be, and was not, granted on or around February 13, 2001.

C.      **Biovail's Anticompetitive Conduct**

**Biovail's "Eleventh Hour" Acquisition of an Exclusive License to the '463 Patent**

49.     On December 19, 2000 (after the District Court's March 6, 2000 ruling in Andrx's favor, but before the February 13, 2001 Federal Circuit court's affirmance), the U.S. Patent and Trademark Office (the "PTO") issued U.S. Patent Number 6,162,463 ("the '463 patent") to its inventor, Dr. Arnold Lippa, the founder and CEO of DOV Pharmaceuticals, Inc. ("DOV"). Dr. Lippa subsequently assigned the patent to DOV.

50.     The '463 patent is a drug product patent and claims various formulations of diltiazem (the same active pharmaceutical ingredient as in Biovail's Tiazac) that combine both a quick-release and an extended-release form of diltiazem. The '463 patent is not a drug substance patent or a method of use patent.

51.     Within days of the patent's issuance, Biovail approached and met with Dr. Lippa in order to negotiate an exclusive license of the '463 patent.

52.     A patent claiming a pharmaceutical product must be listed in the FDA's Orange Book within thirty days of issuance by the PTO in order to trigger Hatch-Waxman provisions that could result in a 30-month stay. As a result, January 19, 2001 was the last day on which Biovail could list the '463 patent in the Orange Book and still be eligible to obtain a second 30-month stay, which precluded the FDA from granting final approval of Andrx's application to sell a generic version of

15

Tiazac. Biovail insisted on completing the license agreement with DOV by no later than January 19, 2001.

53.    On January 12, 2001, Biovail and DOV executed the exclusive license agreement for the '463 patent.

## Biovail Improperly Lists the '463 Patent in the Orange Book

54.    On January 8, 2001, Biovail listed the '463 patent in the Orange Book. In its certification to the FDA supporting the listing, Biovail attested that the '463 patent covered its then approved Tiazac drug product.

55.    On January 30, 2001, Biovail publicly disclosed that it had listed the '463 patent in the Orange Book. Biovail's press release stated that as a result of this listing, FDA approval of any generic version of Tiazac could be delayed for up to thirty months:

> The effect of Biovail's listing of this Patent in the Orange Book is
> that the FDA will require every filer of an ANDA for a generic
> version of Tiazac to also submit a Notice of Certification to Biovail
> on this Patent. As a result, Biovail will consider whether such ANDA
> formulation infringes on its listed Patent and will have the legal right
> to commence a lawsuit against the owner of such ANDA. If Biovail
> determines to commence such suit within 45 days from receipt of the
> Notice of Certification, the Hatch Waxman provisions of the [FDCA]
> will be triggered and the ANDA owner will not be able to obtain final
> approval for up to 30 months.

56.     As explained in more detail below, at the time Biovail listed the '463 patent, the

patent did not qualify for Orange Book listing because it did not claim the form of Tiazac drug

product that the FDA approved for marketing in NDA 20-401 and which Biovail had marketed since

1995. 21 U.S.C. 355(b)(1) specifically sets forth the requirements for patent eligibility for listing in

the Orange Book:

> The applicant shall file with the [NDA] the patent number and expiration date of any
> patent **which claims the drug for which the applicant submitted the application**
> or which claims a method of using <u>such</u> drug and with respect to which a claim of
> patent infringement could reasonably be asserted if a person not licensed by the
> owner engages in manufacture, use or sale of the drug. (emphasis added).

57.     The reference in §355(b)(1) to "such drug" is to the "drug for which the applicant

submitted the application." Consequently, only patents that claim the specific drug approved in an

NDA (or an approved method of using such drug) may be listed in the Orange Book as covering that

drug (or method). Because the '463 patent is a drug product patent, FDA regulations precluded

listing it unless it claimed an approved or pending drug product under the Tiazac NDA.

58.     Biovail was aware that the '463 patent was not eligible for Orange Book listing

because it did not cover the approved Tiazac formulation that Biovail had marketed since 1995. The

drug products claimed in the '463 patent (which DOV first filed with the PTO in 1997) require at

least 1 percent of uncoated or "free" quick-release diltiazem and no more than 99 percent extended-

release diltiazem. By contrast, the only FDA-approved Tiazac formulation that Biovail had ever sold

under the Tiazac NDA contains negligible amounts – that is, less than 1 percent – of uncoated quick-

release diltiazem outside the extended-release coated beads. Because the drug products claimed in

the '463 patent did not cover the Tiazac drug product, the '463 patent was not eligible for listing in

the Orange Book. Because the '463 patent is a drug product patent, FDA regulations precluded listing it unless it claimed an approved or pending drug product under the Tiazac NDA.

59. Rather than claiming the approved Tiazac drug product, the '463 patent claimed only "new drugs" as that term is defined by statute and regulation. By statute, FDA approval is required to market any "new drug." 21 U.S.C. § 355(a). Because FDA approval is only required before marketing "new drugs" (as opposed to drugs that are not "new drugs"), any change in a previously approved drug product that requires FDA approval necessarily creates a new drug. Even minor modifications to a previously-approved drug product result in a "new drug" that requires separate FDA approval. *See, e.g.,* 21 CFR 310.3(h); 21 CFR 314.70. The changes to the approved Tiazac drug product necessary to bring it within the scope of the '463 patent claims would have required FDA approval, thereby necessarily creating a new drug.

60. Indeed, as described in more detail below, on March 23, 2001, FDA advised Biovail that the manufacturing changes at issue resulted in a change in formulation, thus constituting a "*major*" change under the Act. According to the provisions of the Act, "a drug made with a major manufacturing change may be distributed only if, *before* the distribution of the drug as so made, the holder involved submits to the Secretary a *supplemental application* for such change and the Secretary *approves* the application" 21 U.S.C. 356a(c)(1) (all emphases added). *See also,* 21 C.F.R. 314.70(b).

61. Biovail never submitted a supplemental application (sNDA) to its Tiazac NDA for the formulation contained in the '463 patent, as required by the federal regulations, and Biovail obviously never obtained FDA approval for such a supplement. As no supplement was ever submitted and approved, the '463 formulation at issue embodies an unapproved drug, and is

therefore inappropriate for listing in the FDA's "*Approved* Drug Products with Therapeutic Equivalence Evaluation" (a/k/a the Orange Book)(see, 21 U.S.C. § 355(c)(2) "the holder of an *approved* application shall file with the Secretary the patent number and the expiration date of any patent which claims the drug for which the application was submitted")(all emphases added); *see also,* 21 C.F.R. 314.53.

62.    Because the '463 patent did not cover Biovail's approved Tiazac drug product, Biovail did not need a license under the '463 patent to manufacture and sell its FDA-approved Tiazac drug product, and Biovail could have continued to make and sell Tiazac without infringing the '463 patent. Biovail's sole objective in listing the '463 patent was to compel a paragraph IV certification from Andrx so that Biovail could trigger a second 30-month stay on FDA approval of Andrx's ANDA. Absent the exclusive license with DOV and Biovail's resulting ability to sue Andrx for a second 30-month stay, Biovail would not have listed the '463 patent in the Orange Book. Biovail did not need the '463 patent in order to manufacture and sell its existing FDA-approved formulation of Tiazac, and it could have continued to do so without infringing the '463 patent.

63.    DOV, with whom Biovail hastily entered into the licensing agreement relating to the '463 patent, has stated that it "believes that Biovail's actions in listing the DOV diltiazem patent in the Orange Book were taken in major part to secure a stay of FDA approval of Andrx's generic drug, rather than to enforce the DOV diltiazem patent."

64.    By listing the '463 patent in the Orange Book in January 2001, Biovail precluded FDA from granting Andrx final approval to launch its generic Tiazac product in February 2001. Instead, Andrx was required to make a new certification to the FDA concerning the '463 patent, improperly delaying Andrx's entry into the Tiazac market.

19

## Andrx's Challenge of, and the FDA's Questions about, the '463 Patent

65.     On February 1, 2001, Andrx petitioned the FDA to require Biovail to de-list the '463 patent, alleging, among other things, that the '463 patent did not cover the Tiazac product Biovail was then marketing pursuant to its FDA approved NDA.  Specifically, Andrx informed the FDA that:

> This case does not require FDA to delve into patent law.  The simple fact is Biovail has no reasonable basis to upon which assert the "innovative" formulation protected by the '463 Patent covers Tiazac®.
>
> Tiazac® consists solely of coated extended release beads in a capsule. By contrast, the formulation claimed by the '463 patent consists of a mixture of free diltiazem (unblended, uncoated, and not mixed with any other ingredient or excipients) and coated extended release beads, at specified ratios.  Any "innovation" protected by the patent is the specific mixture of two different forms of the pharmaceutical component.

(Emphasis in original).

66.     On February 2, 2001, the FDA nevertheless notified Andrx that it no longer intended to approve Andrx's ANDA at the conclusion of the first 30-month period (February 26, 2001) because Andrx was required to provide a new patent certification addressed to the '463 patent.

67.     On February 7, 2001, and again on February 22, 2001, the FDA, consistent with its limited "ministerial role" in listing patents in the Orange Book, sought confirmation from Biovail that the '463 patent was properly listed for Tiazac.

68.     On or about February 9, 2001, Andrx filed an action in the United States District Court for the Southern District of Florida seeking to force the delisting of the '463 patent from the

Orange Book. Andrx alleged, *inter alia*, that Biovail's listing in the Orange Book was improper

because:

> ...proper listing by Biovail of the '463 patent in the Orange Book required two critical preconditions: (i) that the patent being listed "claim" a formulation used by the brand-name product (here Tiazac); and (ii) that a legitimate and bona fide infringement claim lie with respect to the brand name product. The patent here manifestly and on its face does not and cannot "claim" the Tiazac product. Just as manifestly, no legitimate or bona fide claim could be made that Tiazac infringes the patent. Biovail's listing of the '463 patent was done, not to protect any legitimate intellectual property rights, but solely for the purposes of delaying FDA's approval of Andrx's lower-priced generic.

69.     Further, Andrx averred in the complaint that "Andrx is ready and willing to market its

lower-priced version of Tiazac promptly upon receiving FDA approval to do so. Absent the

misconduct of Biovail challenged herein, the FDA would have granted that approval no later than

February 26, 2001. Unless this Court immediately enjoins Biovail's sham listing of the '463 patent

in the Orange Book, Andrx will be irreparably harmed...."[1]

70.     On February 26, 2001, as a result of a court filing by Biovail in response to Andrx's

suit to force Biovail to de-list the '463 patent, the FDA learned that Biovail asserted that the '463

patent covered a new formulation of Tiazac that Biovail had developed only after it had acquired the

exclusive license to, and listed, the '463 patent, rather than covering the version of Tiazac that

Biovail had previously been marketing.

71.     On March 23, 2001, the FDA sent two letters to Biovail. In one letter, the FDA

informed Biovail that its new formulation of Tiazac was not approved by the FDA under the Tiazac

NDA:

---

[1] Andrx's president and chief executive officer, Elliott Hahn, repeated Andrx's position in a January 9, 2002 article: "[h]ad (Biovail) not listed this patent in the Orange Book, we believe

Based on the material that you have submitted to the agency and the explanation that you provided at the March 20 meeting [between the FDA and Biovail], FDA has determined that the described manufacturing change constitutes a "major" change under the Act because it results in a change in formulation of the product and it may affect the controlled release product. You admit that these changes result in 1.1% of free diltiazem, the active ingredient in the product, being available for immediate release, whereas the approved drug product does not contain any intended amounts of free diltiazem. Thus, the drug product resulting from this manufacturing change is not your approved diltiazem drug product.

72.     The other March 23, 2001 letter reiterated that the new formulation was not Biovail's

approved Tiazac product and that the FDA would de-list the '463 patent from the Orange Book

unless Biovail amended its certification to indicate that the '463 patent claimed the version of Tiazac

that the FDA had approved.  The FDA explained:

The approved Tiazac NDA does not provide for the manufacturing changes Biovail has described which result in free diltiazem being available for immediate release. The approved drug product does not contain any intended amounts of free diltiazem. Biovail must submit a supplement to its NDA, which must then be approved by the agency, before Biovail may market the drug product containing free diltiazem.

Therefore, the agency has determined that Tiazac as manufactured to contain immediate release diltiazem hydrochloride powder and diltiazem in the time release coated beads does not fall within the approved NDA 20-401, and it thus not an approved drug. The only form of Tiazac currently approved contains diltiazem hydrochloride only in time-release coated beads.

*** 

Listing of the '463 patent

that we would have received final approval [for generic Tiazac]."

22

The agency has determined that Tiazac capsules containing both immediate release diltiazem hydrochloride powder and diltiazem hydrochloride in time-release coated beads are not approved. In light of this determination, Biovail must now state whether the '463 patent covers the approved Tiazac product, which contains diltiazem hydrochloride only in time-release coated beads.[2] If Biovail determines the '463 patent covers approved Tiazac as described above at page two, it must submit the declaration described in this letter by 5PM Monday, March 26, 2001. If Biovail does not submit an adequate declaration by that time, the agency will consider Biovail to have withdrawn the '463 patent.

The agency believes that in the current circumstances where a question has arisen regarding the characteristics of the approved drug product, particularly in the context of litigation where FDA is a party, FDA's primary responsibility is to clarify the identity of the approved drug product. The NDA holder then must determine whether the patent meets the requirements for listing with respect to the approved drug. Therefore, FDA is providing Biovail the opportunity to determine whether the '463 patent covers the approved Tiazac product as identified by FDA.

FDA's determination that Biovail will be considered to have withdrawn the '463 patent, should the company fail to submit the required declaration, is based upon the specific facts of this matter. Most importantly, Biovail's original declaration was based upon an incorrect understanding of the identity of the approved drug product. Biovail's specific representations in the Florida district court lead the agency to reasonably conclude that Biovail believes the '463 patent can only be listed for Tiazac if the approved NDA covers the changes in manufacture and formulation resulting in the product containing both immediate release diltiazem hydrochloride powder and diltiazem in time-release coated beads. The declarations of Paul Maes and John R. Markus (Attachments to Memorandum of Defendant Biovail Corporation in Opposition to Plaintiff's Motion for Expedited Treatment and Preliminary Injunction) ("Mem. In Opp.") are specifically intended to support the assertion that these changes are approved. In addition, Biovail submitted additional material and met with the agency to make similar assertions. At many points throughout its Mem. In Opp., Biovail states that it is this change to the product that brings Tiazac within the scope of the patent. See, e.g., Mem. In Opp. At pp. 4, 6, 7, 8. Thus it is reasonable to infer that the absence of clarification by Biovail for the patent's listing confirms the implication that the patent could not be listed for Tiazac as manufactured and formulated before the changes.

---

[2] Biovail has represented that the Tiazac product containing only time-release coated beads included only negligible traces, if any, of diltiazem in powder form.

73.     Additionally, the FDA warned Biovail in connection with its submission of the required declaration, that "a false statement of material fact in such declaration is subject to prosecution under 18 U.S.C. §1001."

74.     On March 26, 2001, Biovail submitted a signed one page declaration to the FDA stating that "Biovail hereby confirms its belief that the '463 patent is eligible for listing in the FDA's Orange Book in connection with Biovail's drug product Tiazac." This declaration did not clarify whether the term "Tiazac" as used by Biovail meant FDA-approved Tiazac (as the FDA required) or Biovail's revised, but not FDA approved, form of the product.

75.     As revealed in papers filed by the FDA in the federal lawsuit by Andrx to force Biovail to de-list the '463 patent, it is clear that the FDA understood Biovail's March 26, 2001, declaration as "affirming the '463 patent covers the *currently approved* Tiazac product" (emphasis added), and, on that basis, decided not to de-list the '463 patent from the Orange Book. Biovail, however, continued to assert that listing the '463 patent in the Orange Book was justified because it covers a revised form of Tiazac that Biovail asserted fell within the Tiazac NDA, but which the FDA had explicitly informed Biovail was not covered under the Tiazac NDA. Indeed, in the de-listing litigation Biovail conceded that the "FDA filings in this case preliminarily stated that the ['463] patent does not claim the approved drug product in the Tiazac NDA." Nevertheless, after obtaining the '463 patent, Defendants apparently manufactured and sold the revised Tiazac that the FDA informed Biovail was not covered under the Tiazac NDA.

76.     Biovail's acts in procuring the listing of the '463 patent in the Orange Book were fraudulent, and were made in bad faith in an attempt to interfere with the entry of generic competition into the relevant market. Biovail had no reasonable basis for the representations it made

to the FDA in order to obtain the listing of the '463 patent in the Orange Book. Because of Forest's and Biovail's obligations to each other under the licensing and supply agreements, Biovail was required to inform Forest of communications with the FDA and, as a result, Forest knew of the bad faith listing of the '463 patent after the FDA had informed Biovail that the Tiazac NDA did not cover the revised formulation.

77.    Biovail's anti-competitive acts of deceiving the FDA are thus not entitled to immunity under the Noerr-Pennington (or any other) doctrine.

**Biovail Initiated Sham Litigation Against Andrx Based on the '463 Patent**

78.    On February 16, 2001, Andrx filed a paragraph IV certification with the FDA, certifying that its generic Tiazac product (Taztia) would not infringe any valid claim of the '463 patent. Sometime thereafter, Andrx notified Biovail of this certification.

79.    On April 5, 2001, Biovail filed a sham lawsuit against Andrx alleging infringement of the '463 patent, thereby triggering a second 30-month stay under the Hatch-Waxman Act, and precluding the FDA from granting final approval to Andrx's ANDA for generic Tiazac.

80.    The '463 patent does not claim the FDA approved Tiazac and no claim of infringement could reasonably be asserted if anyone not licensed by the '463 patent engaged in the manufacture, use, or sale of FDA approved Tiazac. Further, because the FDA-approved Tiazac drug product is prior art to the '463 patent under 35 U.S.C. § 102(b), any claim in the '463 patent that did cover Tiazac would be invalid as a matter of law.

81.    Similarly, no claim of infringement could reasonably be asserted if anyone not licensed by the '463 patent engaged in the manufacture, use, or sale of Andrx's Taztia drug product. As is true for FDA-approved Tiazac, the '463 patent does not claim the generic Tiazac product that

25

was the subject of Andrx's ANDA. Like the FDA-approved Tiazac product, Andrx's Taztia generic product does not contain a quick-release form of diltiazem as required by the claims of the '463 patent. As noted above, the products claimed in the '463 patent require at least 1 percent of quick-release diltiazem in addition to extended-release diltiazem. By contrast, both the FDA-approved Tiazac formulation and Andrx's generic Taztia drug product contain negligible amounts – that is, less than 1 percent – of uncoated immediate-release diltiazem. Andrx's Taztia product, like the prior art to the '463 patent, consists exclusively of extended release diltiazem. Consequently, any claim of the '463 patent construed to cover Andrx's Taztia drug product would necessarily be invalid.

82.     Moreover, on its face, the '463 patent expressly distinguishes its claimed invention from extended-release diltiazem products that were available in the United States at the time the original application was filed, including Tiazac (defined in the patent as "Diltiazem OD ER"). Throughout the patent, the results of administering the claimed invention are compared and contrasted with the results obtained from administering Tiazac. Obviously, because the claimed invention states repeatedly that it is different from and/or better than Tiazac, it cannot "claim" or cover Tiazac and other prior art compounds that employ exclusively extended-release diltiazem. The '463 patent does not "claim" or cover Tiazac or any other drug product – like Andrx's Taztia drug product – that consists exclusively of extended release diltiazem.

83.     In addition, because Tiazac has been on sale in the United States since 1995, more than a year before the earliest possible filing date for the '463 patent, it constitutes "prior art" under 35 U.S.C. § 102(b). Accordingly, if the patent did in fact cover Tiazac, it would be invalid.

84.     Biovail had no reasonable basis to assert either that the '463 patent claimed either Tiazac or Andrx's Taztia drug product or that a claim for infringement of the '463 patent could

26

possibly be asserted against anyone not licensed by the '463 patent engaged in the manufacture use or sale of either Tiazac or Andrx's Taztia drug product. Biovail's infringement action was a sham, was objectively baseless, and Biovail knew it. Because of the Forest's and Biovail's obligations under the licensing and supply agreements, including Biovail's and Forest's responsibilities for infringement litigation and their responsibility to inform each other of communications to and from the FDA relating to the Tiazac NDA, Biovail was obligated to make Forest aware of the '463 patent litigation.

85.     Biovail's only motive in listing the '463 patent and subsequently suing Andrx for infringement was to illegally maintain its monopoly by further delaying the FDA's approval of Andrx's generic Tiazac and launch of a lower-priced generic competitor to Defendants' Tiazac so that Defendants could continue to sell Tiazac at supra-competitive prices.

86.     Absent the wrongful listing and sham litigation, Biovail would not have received the automatic 30-month regulatory stay. To legally obtain similar relief, Biovail would have had to persuade the court to issue a preliminary injunction – which would have required Biovail to establish, *inter alia*, that it was likely to succeed on the merits of the patent suit and that the public would not be harmed by the injunction. *See, Ranbaxy Pharmaceuticals, Inc. v. Apotex*, 350 F.3d 1235, 1239 (Fed. Cir. 2003). Given the baselessness of Biovail's infringement claim and the state of the prior art, (described, *inter alia,* at ¶¶69-73), such a showing would have been virtually impossible.

87.     Biovail's anti-competitive acts of engaging in sham litigation are not entitled to immunity under the Noerr-Pennington (or any other) doctrine.

**Biovail Delists the Patent**

27

88.     In early January 2002, the Federal Trade Commission ("FTC") was investigating Biovail's conduct in connection with the '463 patent.

89.     On April 5, 2002, Biovail executed an Agreement Containing Consent Order ("Consent Order") with respect to the FTC's investigation into the propriety of Biovail's actions relating to the '463 patent. Under the Consent Order, Biovail was required to seek the dismissal with prejudice of any and all claims relating to enforcement of the '463 patent. Moreover, Biovail was required to "cease and desist from taking any action that initiates, maintains, or causes to be initiated or maintained, a 30-month stay of FDA final Approval of ANDA No. 75-401."

90.     Additionally, the Order provided:

No later than ninety (90) days after Respondent signs the Agreement Containing Consent Order in this matter, Respondent shall divest, absolutely, in good faith, and only in a manner that receives the prior approval of the Commission, the Assets To Be Divested to DOV.

91.     On April 11, 2002, almost a year after filing the '463 patent in the Orange Book, Andrx announced that it had been advised by Biovail that Biovail would formally withdraw its listing of the '463 patent from the Orange Book and would dismiss all patent infringement claims against Andrx with respect to the '463 patent.

## VI. TRADE AND COMMERCE

92.     At all material times, Tiazac, manufactured by Biovail and sold by Forest, was shipped across state lines and sold to customers located outside its state of manufacture.

93.     During the relevant time period, in connection with the purchase and sale of Tiazac, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

28

94.     During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged in this Complaint were within the flow of, and have substantially affected, interstate commerce.

## VII. MONOPOLY POWER

95.     Defendants possessed monopoly power over the price of Tiazac Products prior to generic entry. Defendants maintained that power by delaying the entry of competing generic versions of Tiazac through conduct alleged in this Compliant. To the extent the law requires defining a relevant product market, the relevant product market is Tiazac Products, *i.e.*, Tiazac and all generic bioequivalent versions of Tiazac. Market entry of generic bioequivalent versions of Tiazac resulted in a significant, immediate shift in the sales of branded Tiazac to generic Tiazac, and to a significant reduction in the average price paid for Tiazac Products.

96.     To the extent the law requires it, the relevant geographic market is the United States and its territories.

97.     But for Biovail's illegal acts as alleged in this Complaint, Andrx would have come to market with competing generic versions of Tiazac on or about February 13, 2001. From that date until April 10, 2003, when Andrx was finally allowed by the FDA to start selling generic Tiazac, and did, in fact, start doing so, Defendants' market share in the relevant market was at all relevant times 100%.

98.     Defendants' actions as part of, and in furtherance of, the illegal monopolization alleged herein, were authorized, ordered or done by Defendants' officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

99.    Biovail's illegal acts to prevent the introduction into the U.S. marketplace of any generic version of Tiazac undertaken in furtherance of its joint venture or combinations with Forest resulted in Plaintiffs and the Class paying more than they would have paid for Tiazac Products absent Defendants' illegal conduct.

## VIII. EFFECTS ON COMPETITION

100.    Biovail's exclusionary conduct blocked the entry of less expensive generic versions of Tiazac, and unlawfully enabled Defendants to sell Tiazac without being subject to generic competition for many months. But for Biovail's illegal conduct, Andrx would have begun marketing generic versions of Tiazac on or around February 13, 2001, and subsequently, other generic competitors would have entered the market as well.

101.    If generic competition had been able to enter the market and compete with Defendants earlier, Plaintiffs and other direct purchaser members of the Class would have substituted lower-priced FDA- approved generic versions of Tiazac for the higher-priced brand-name drug for some or all of their Tiazac requirements earlier and would have received discounts on some or all of their branded Tiazac purchases earlier.  By preventing generic competition from entering the market and willfully maintaining their monopoly, Defendants caused Plaintiffs and other direct purchasers of Tiazac to pay substantially more for Tiazac Products than they otherwise would have paid.

## IX. DAMAGES TO MEMBERS OF THE CLASS

102.    Plaintiffs and members of the Class purchased substantial amounts of Tiazac from Defendants.  Subsequent to the entry of generic Tiazac, Plaintiffs and members of the Class also purchased substantial quantities of generic Tiazac.  As a result of the illegal conduct of Defendants, members of the Class were compelled to pay, and did pay, artificially inflated prices for their Tiazac Products.  Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the price of branded Tiazac was artificially inflated by Defendants' illegal conduct; and/or (2) class members were deprived of the opportunity to purchase lower-priced generic versions instead of brand-name Tiazac; and/or (3) the price of generic Tiazac was artificially inflated by Defendants' conduct.  As a consequence, members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

## X.  DEMAND FOR TRIAL BY JURY

103.    Plaintiffs demand trial by jury on all issues so triable.

## COUNT 1

## Monopolization (15 U.S.C. § 2)

104.    Plaintiffs incorporate by reference the allegations above, as if fully set forth herein.

105.    At all relevant times, Defendants possessed monopoly power over the price of Tiazac Products in the United States.  But for Defendants' exclusionary and anti-competitive conduct, as alleged herein, Defendant would not have maintained monopoly power as alleged herein.

106.   Defendants knowingly, willfully, and wrongfully maintained its monopoly power by, *inter alia*: (a) knowingly and willfully making false and misleading representations to the FDA to obtain the listing of its '463 patent in the FDA's Orange Book; and (b) prosecution of baseless, sham patent litigation against one of its prospective generic competitors.

107.   Defendants' acts were taken in bad faith, for the purpose and with the effect of maintaining its monopoly and unreasonably restraining competition.

108.   Plaintiffs have been injured in its business and property by reason of Defendant's anti-competitive activities.  Plaintiffs' injuries consist of paying higher prices for Tiazac than they would have paid in the absence of Defendant's anti-competitive conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendant's conduct unlawful.

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully pray that:

(i)     The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Procedure, be given to the Class;

(ii)    The acts alleged herein be adjudged and decreed to be unlawful acts of monopolization in violation of Section 2 of the Sherman Act;

(iii)   Each member of the Class recover three-times the damages determined to have been sustained by each of them, and that judgment be entered against Defendant in favor of the Class;

(iv)    The Class recover its costs of suit, including reasonable attorneys' fees and costs as provided by law; and

(v)     The Class be granted such other, further relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

32

Dated: December 27, 2004

Bruce E. Gerstein, Esquire
Barry Taus, Esquire
Kevin Landau, Esquire
GARWIN, GERSTEIN
 & FISHER, L.L.P.
1501 Broadway, Suite 1416
New York, NY 10036
Phone: 212-398-0055
Fax:    212-764-6620


Daniel Berger, Esquire
Eric L. Cramer, Esquire
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone: 215-875-3000
Fax:    215-875-4671


David P. Smith, Esquire
David D. Brooks, Esquire
PERCY, SMITH, & FOOTE, LLP
720 Murray Street
P.O. Box 1632
Alexandria, Louisiana 71309
Phone: 318-445-4480
Fax:    318-487-1741


John Gregory Odom, Esquire
Stuart Des Roches, Esquire
Andrew Kelly, Esquire
ODOM & DES ROCHES
Poydras Center
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Phone: 504-522-0077
Fax:    504-522-0078

33

Robert Muse, Esquire
David Fierst, Esquire
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Avenue
Suite 1100
Washington D.C. 20036
Phone: 202-737-7777
Fax: 202-296-8312

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Robert Muse, Esquire
David Fierst, Esquire

34